**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

---

ERIC HARDING,

                           Plaintiff,

v.                                           No. 13-CV-1162
                                                          (MAD/CFH)
DONALD VENETTOZZI, Acting Director of SHU;
RANDY LAMORA, Hearing Officer

                           Defendants.

---

**APPEARANCES:**                                        **OF COUNSEL:**

ERIC HARDING
Plaintiff Pro se
08-A-3546
Auburn Correctional Facility
Post Office Box 618
Auburn, New York 13021

HON. ERIC T. SCHNEIDERMAN            JOSHUA L. FARRELL, ESQ.
Attorney General for the                   Assistant Attorney General
   State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**CHRISTIAN F. HUMMEL
U.S. MAGISTRATE JUDGE**

# REPORT-RECOMMENDATION AND ORDER[1]

   Plaintiff pro se Eric Harding (hereinafter "the Plaintiff" or "Harding"), an inmate currently in the custody of the New York State Department of Correctional and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, Donald Venettozzi and Lieutenant Randy LaMora, violated his rights under the

---

     [1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Fourteenth Amendment. Complaint (Dkt. No. 1). Presently pending is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. Dkt. No. 23-3. Harding opposes the motion. Dkt. No. 32-1. For the following reasons, it is recommended that defendants' motion be granted.

## I. Background

Plaintiff Eric Harding is a New York State prison inmate assigned to the custody and care of DOCCS. <u>See</u> generally Compl. At the times relevant set forth in his complaint, Plaintiff was designated to the Clinton Correctional Facility (hereinafter "Clinton") located in Dannemora, New York. <u>Id.</u>

### A. Underlying March 2011 Incident

On March 26, 2011, Inmate Swimley was authorized to transport the Plaintiff's property while the Plaintiff executed a cell move. Dkt. No. 23-7 at 8. While the cell move was in process, Correctional Officer Duprey observed the Plaintiff make slashing motions toward Inmate Swimley. <u>Id.</u> Upon observing this event, Officer Duprey ordered the Plaintiff to desist, at which time Officer Duprey saw the Plaintiff hand an unidentified object to Inmate Martin who was in a different cell and allegedly flushed the object down the toilet. <u>Id.</u> Correctional Services Staff responded and Officer Benware placed the Plaintiff in restraints and frisked his body. <u>Id.</u> Upon frisking the Plaintiff, Officer Benware "discovered several magazines and catalogs tied around [the Plaintiff's] midsection as homemade body armor." <u>See</u> <u>id.</u> at 8, 39.

After escorting the Plaintiff to the hospital in Clinton, Officer Duprey then interviewed the

Plaintiff and Inmate Swimley. Dkt. No. 23-7 at 8. Upon questioning by Officer Duprey, Inmate Swimley indicated that the Plaintiff did in fact pass off the weapon the Plaintiff used to assault him to Inmate Martin. Id. This information was corroborated by the Plaintiff upon questioning by Officer Duprey admitting he told Inmate Martin to flush the weapon down the toilet. Id. No other admissions were made by the Plaintiff thereafter regarding the alleged assault. Id. Subsequently, the Plaintiff was seen by a medical team, where no injuries were discovered, and then placed under keeplock. Id. Conversely, as a result of the incident Inmate Swimley incurred lacerations on his head (requiring multiple staples), neck, back and forearm (requiring steri strips), and hand (requiring twelve stitches total). See id. at 7, 12, 40–48.

### B. April 2011 Tier III Disciplinary Hearing

On March 27, 2011, the Plaintiff was served with a misbehavior report charging him with the following rule violations: "Assault or Attempt to inflict bodily harm; 113.10, Weapon; 100.13, Inmate shall not engage in fighting and 113.11, Inmate shall not alter items to change original intent." Tier III Hrg. Trans. (Dkt. No. 23-8)[2] at 2, 5. On April 12, 2011 during the Plaintiff's disciplinary hearing, the Plaintiff was read the description of the incident and the aforementioned charges, by defendant and then-Acting Captain Lamora during which time the Plaintiff entered a not guilty plea on all charges. Id. at 2, 5–6. The Plaintiff does not dispute that he was notified of his charges. See Tier III Hrg. Trans. at 2, 5; see also Compl. Prior to the date of the Hearing, the Plaintiff also received assistance to prepare for

---

[2] References to the Tier III Hearing Transcript are based upon the page number found in the Header of the document.

3

the proceeding.  See Tier III Hrg. Trans. at 3; see also Dkt. No. 23-5 at 10.

Prior to the Hearing, the Plaintiff requested five inmates to testify on his behalf; three refused to testify, and the other two were Inmate Swimley and Inmate Martin.  Lamora Declaration (Dkt. No. 23-6) at ¶¶ 10–11.  Harding contends in his opposition that there was, at best, confusion and, at worst, fraud regarding the assistant sheet and the answers as to whether inmates Swimley and Martin would testify.  Lamora Decl. at ¶ 10; Dkt. No. 32-1 at 2–3.  These inmates "each initially refused to testify, but then changed their minds." Lamora Decl. at ¶ 11.  Defendant Lamora denied the Plaintiff's request to call Inmate Swimley based on his decision in an affidavit, submitted as a result of the case at bar, "that it would be unduly hazardous to institutional safety and security to allow [Inmate Swimley and the Plaintiff] to confront each other during a disciplinary hearing that could become adversarial[,]" and "that calling [Inmate Swimley] to testify would pose an undue risk to [the defendant's] safety and security[]" since Inmate Swimley would have to be present with Lamora and could become violent in the proceeding.  Id. at ¶¶ 14–15.  According to Lamora's affidavit submitted to the Court, Lamora denied the Plaintiff's request to call Inmate Martin because he believed that it was unlikely Inmate Martin would testify truthfully, given that he too was issued a misbehavior report in connection with the incident, thus doing so would incriminate Martin and subject him to disciplinary sanctions.  Id. at ¶ 17; see also Dkt. No. 23-7 at 27 (detailing Inmate Martin's misbehavior report).  Moreover, in regards to both Inmates Swimley and Martin, Lamora believed the inmates could be subjected to retaliation should they have testified in opposition to the Plaintiff.  Lamora Declaration at ¶ 16.

During the Hearing, the Plaintiff denied the assault allegations and claimed there was no

weapon involved. Tier III Hrg. Trans. at 6, 10. Further, the Plaintiff told Lamora that he was in fear of his life due to a prior incident where he was a victim of assault. Id. at 7. In response, Lamora said "[s]o what it looks like to me is that you struck first that way nobody could take the chance of getting you first. You went after him first. That's what it looks like to me." Id,

Subsequently, the Plaintiff then inquired into whether the injuries on Inmate Swimley could have been caused by another individual or an accident. Tier III Hrg. Trans. at 8–9. Both inquires were refuted by Lamora claiming the former would have been discovered by Correctional Staff and the latter impossible since some of the injuries were physically incapable of being self-inflicted. Id. To refute these claims, the Plaintiff then requested the Nurse to appear at the Hearing to testify; Lamora denied this request because the Nurse could not provide direct testimony regarding the assault as she did not personally observe the March 2011 incident. Id. at 9. The Plaintiff then requested a postponement of the Hearing in order "to get something in [his] cell . . . ." Id. at 10. Lamora granted the Plaintiff's request on the condition that the item was pertinent to the Hearing, however, the Plaintiff quickly retracted his request shortly thereafter. Id. at 10–11.

Upon concluding, the Plaintiff objected to the Hearing on the grounds that his witnesses were denied and that the Hearing was not fair and impartial. Tier III Hrg. Trans. at 12. Lamora then adjourned the Hearing to render a written disposition on the matter. Id. After rendering his written disposition, the Plaintiff was found guilty on all charges and sentenced to twelve months in the Special Housing Unit (SHU)[3] and twelve months loss of

---

[3] SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population . . . ." N.Y. COMP. CODES R. & REGS. tit 7, § 300.2(b). Inmates are confined in a

5

commissary, phones and recreation in order to deter the Plaintiff from committing similar violations in the future.  Id.; see Dkt. No. 23-5 at 8.  In reaching his disposition, Lamora relied on Correctional Officer Duprey's written report, testimony by a third party from the New York State Office of Mental Health stating that there were no mitigating mental health factors to contribute to Harding's action, and the Plaintiff's failure "to provide a credible testimony [on his] behalf . . . ."  Dkt. No. 23-5 at 9; Dkt. No. 23-7 at 16; Tier III Hrg. Trans. at 7, 12, 16.

### C.  Abrogation of SHU Sentence

On June 9, 2011, the Plaintiff's Tier III Hearing sentence was affirmed.  Dkt. No. 23-5 at 4.  However, over a year later, the Plaintiff's sentence was then administratively reversed pursuant to a conversation with the Attorney General's Office on October 11, 2012.  Id. at 2.  According to Lamora, the administrative reversal was due to Lamora's failure to put in writing his reasons for denying the Plaintiff's requested witnesses at the Tier III Hearing pursuant to D.O.C.C.S. Directive 4932, Part 253.5, 7 N.Y.C.R.R. Section 253.5. Lamora Decl. at ¶¶ 5–6.  The Plaintiff then filed this action.  See generally Compl.

### II.  Discussion

Harding contends that the defendants deprived him of his Fourteenth Amendment rights by denying him procedural due process in connection with the disciplinary hearing at issue.

Defendants seek summary judgment dismissing the complaint in its entirety. Dkt. No.

---

SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required.  Id. at pt. 301.

23-3 at 6. Defendants specifically move for summary judgment on the grounds that: (1) the Plaintiff's due process rights were not impaired during his disciplinary hearing, and (2) the defendants are entitled to qualified immunity. Id. at 8, 16.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223–24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471,

477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," . . . that a pro se litigant's submissions must be construed "liberally,". . . and that such submissions must be read to raise the strongest arguments that they "suggest," . . . . At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, . . . or arguments that the submissions themselves do not "suggest," . . . that we should not "excuse frivolous or vexatious filings by pro se litigants," . . . and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law . . . ."

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191–92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, . . . a court is obliged to construe his pleadings liberally.'" (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. Anderson, 477 U.S. at 247–48.

### B. Fourteenth Amendment

The Due Process Clause of the Fourteenth Amendment states that "[n]o State shall . . . deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV § 1. It is important to emphasize that due process "does not protect against all deprivations of liberty. It protects only against deprivations of liberty accomplished without due process of the law." Baker v. McCollan, 443 U.S. 137, 145 (1979) (internal quotation and citations omitted). "A liberty interest may arise from the Constitution itself, . . . or it may

8

arise from an expectation or interest created by state laws or policies." Wilkinson v. Austin, 545 U.S. 209, 221 (2005) (citations omitted). An inmate retains a protected liberty interest in remaining free from segregated confinement if the prisoner can satisfy the standard set forth in Sandin v. Conner, 515 U.S. 472, 483–84 (1995).

### 1. Liberty Interest

To state a claim for procedural due process, there must first be a liberty interest which requires protection. See generally Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir. 1994) ("[Procedural] due process questions [are analyzed] in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (citing Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989)). The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the prisoner's [segregated] confinement . . . relative to the conditions of the general prison population[]" are to be considered. Vasquez v. Coughlin, 2 F. Supp. 2d 255, 259 (N.D.N.Y. 1998) (citations omitted). This standard requires a prisoner to establish that the confinement or condition was atypical and significant in relation to ordinary prison life. See Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir.1999); Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir.1996).

While not a dispositive factor, the duration of a disciplinary confinement is a significant factor in determining atypicality. Colon v. Howard, 215 F.3d 227, 231 (2d Cir. 2000) (citations omitted). The Second Circuit has not established "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights." Palmer v.

Richards, 364 F.3d 60, 64 (2d Cir. 2004) (citations omitted). Instead, the Second Circuit has provided guidelines that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—'development of a detailed record' of the conditions of confinement relative to ordinary prison conditions is required." Id. at 64–65 (quoting Colon, 215 F.3d at 232). In the absence of a dispute about the conditions of confinement, summary judgment may be issued "as a matter of law." Id. at 65 (citations omitted). Conversely, where an inmate is confined under normal SHU conditions for a duration in excess of an intermediate disposition, the length of the confinement itself is sufficient to establish atypicality. Id. (citing Colon, 215 F.3d at 231–32). Also, "[i]n the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short—e.g. 30 days—and there was no indication [of] . . . unusual . . . conditions." Harvey v. Harder, No. 09-CV-154 (TJM/ATB), 2012 WL 4093792, at *6 (N.D.N.Y. July 31, 2012) (citing inter alia Palmer, 364 F.3d at 65–66).[4]

Based on the facts of the case at bar, after the Tier III disciplinary hearing, Harding was sentenced to 365 days in SHU confinement–greatly in excess of an intermediate duration set down in Colon and its progeny. See Dkt. No. 23-8 at 12. Therefore, based on the length of confinement alone, there was no factual dispute that Harding suffered from atypical and significant confinement sufficient enough to establish a protected liberty interest.

---

[4] All unpublished opinions cited to by the Court in this Report-Recommendation are, unless otherwise noted, attached to this Recommendation.

## 2. Procedural Due Process

Defendants argue that Harding was afforded ample due process. While inmates are not given "the full panoply of [due process] rights," they are still afforded procedural due process. Wolff v. McDonnell, 418 U.S. 539, 556 (1974). A prisoner is "entitled to advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition including the evidence relied upon and the reasons for the disciplinary actions taken." Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted).

### a. Written Notice

In this case, although the Plaintiff does not argue it, Harding received proper written notice. See generally Dkt. No. 32-1. An inmate must be provided advance written notice of the charges against him at least twenty-four hours before the disciplinary hearing commences. Wolff, 418 U.S. at 563–64. Notice must be written "in order to inform [the inmate] of the charges and to enable him to marshal the facts and prepare a defense." Id. at 564.

Harding received notice of his formal charges on March 27, 2011, well in advance of his Tier III disciplinary hearing which took place on April 12, 2011. See Tier III Hrg. Trans. at 2. Moreover, prior to the Plaintiff's disciplinary hearing, Harding received assistance to prepare for the proceeding. See id. at 3; see also Dkt. No. 23-5 at 10.

### b. Opportunity to Call Witnesses and Present Documentary Evidence

Harding contends that he was deprived of an opportunity to call all his requested witnesses and present some documentary evidence. However, "[i]t is well settled that an official may refuse to call witnesses as long as the refusal is justifiable [such as] . . . on the basis of irrelevance or lack of necessity." Scott v. Kelly, 962 F.2d 145, 146-47 (2d Cir. 1992) (quoting Kingsley v. Bureau of Prisons, 937 F.2d 26, 30 (2d Cir. 1991)).

With respect to documentary evidence, Harding requested an adjournment to retrieve an item from his cell, but although the request was granted by Lamora, Harding withdrew his request quickly thereafter deciding that he did not need the item in his cell. See Dkt. No. Tier III Hrg. Trans. at 11.

As for witnesses, Harding requested five inmates to testify on his behalf, however three of those inmates refused to testify. Lamora Decl. at ¶ 11. Under Federal law, "[h]earing officers have no power to force an inmate to testify . . . [and] 'if a witness will not testify if called, it cannot be a "necessity" to call him and it would be futile to do so.'" Tafari v. McCarthy, 714 F. Supp. 2d 317, 377 (quoting Silva v. Casey, 992 F.2d 20, 21–22 (2d Cir. 1993). The other two inmates Harding requested were Inmate Swimley and Inmate Martin. Lamora Decl. at ¶ 10. Federal law holds that "'prison officials . . . explain, in a limited manner, the reason why witnesses were not allowed to testify' either at the time of the request or later when the decision is challenged." Dixon v. Goord, 224 F. Supp. 2d 739, 746 (S.D.N.Y. 2002) (quoting Ponte v. Real, 471 U.S. 491, 497 (1985)); see Wolff v. McDonnell, 418 U.S. 539, 566 (1974) ("Prison officials must have the necessity discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority . . . .") (emphasis added)). Under Federal law, "so

12

long as the reasons are logically related to preventing undue hazards to "'institutional safety or correctional goals,'" that is sufficient to meet the Wolff standard. Ponte, 471 U.S. at 497.

According to Lamora, Harding's request for Swimley was denied due to his belief that having Swimley and Harding together during an adversarial hearing could jeopardize institutional safety and security. Lamora Decl. at ¶ 14. Although Harding would be behind a glass partition, Swimley would have to be present with Lamora ultimately creating a risk to Lamora's safety if the hearing were to become confrontational. Id. at ¶15.

Regarding Martin, Lamora believed any statements made by Martin would be false on the basis that testifying truthfully would incriminate himself and subject him to disciplinary sanctions. Id. at ¶17. Moreover, Lamora believed that, despite the initial reasons for denial, both Swimley and Martin could be subjected to retaliation if their testimonies were adverse to Harding. Id. at ¶16. Although these reasons were not given on the record at the disciplinary hearing, Lamora explained these reasons in an affidavit transcribed in response to this suit. See Lamora Decl. Additionally, in the hearing Harding requested the nurse, who took care of Swimley, to appear as a witness on his behalf. See Tier III Hrg. Trans. at 9. Lamora responded by denying this request due to the fact that the nurse did not personally observe the incident. Id. Harding's request for the nurse to appear as a witness for him would have been irrelevant to the case and as such, Lamora's denial of this request was proper. See Scott, 962 F.2d at 146-47.

Since Lamora detailed his reasons for rejecting the nurse to testify at the hearing itself, and explained why the five inmates did not testify in Lamora's affidavit supplied in response to the instant suit, i.e. later, Lamora's actions are sufficient to comport with constitutional due process protections afforded to an inmate's disciplinary proceedings. Thus,

13

defendants' motion on this ground should be granted.

### c. Fair and Impartial Hearing Officer

Harding contends that Lamora was not an impartial hearing officer because Lamora made biased remarks while presiding over the hearing and refused to call Harding's witnesses. See Dkt. No. 32-1 at 3. Prisoners have a constitutional right to a fair and impartial hearing officer. See, e.g., Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004). However, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges . . . [as i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." Allen v. Cuomo, 100 F.3d 253, 259 (2d Cir. 1996) (citations omitted). The Supreme Court held "that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer] . . ." and the Second Circuit has held that the test is whether there was "'reliable evidence' of the inmate's guilt." Luna v. Pico, 356 F.3d 481, 487–88 (2d Cir. 2004); see also Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 455 (1985).

Despite Harding's contentions otherwise, for the reasons discussed supra, Lamora was not biased or unfair in his decision not to allow certain witnesses to testify, but rather he was within his discretion to deny calling certain witnesses and admitting certain evidence.

Even though Harding's guilty determination was reversed, there is no clear evidence that Lamora was not a fair and impartial hearing officer. See Robison v. Via, 821 F.2d 913, 923 (2d Cir. 1987) ("Federal constitutional standards rather than state statutes define the requirements of procedural due process."). According to Lamora, the determination was presumably reversed on the grounds that Lamora failed to give Harding a written statement

stating the reasons that he was denied his requested witnesses at the hearing pursuant to D.O.C.C.S. Directive 4932, Part 253.5, 7 N.Y.C.R.R. Section 253.5.  See Lamora Decl. at ¶¶ 5–6.  Although Lamora's omissions may have violated state regulations, such a failure does not rise to the level of a due process violation.  See Hinton v. Prack, No. 9:12-CV-1844 (LEK/RFT), 2014 WL 4627120, at *12 (N.D.N.Y. Sept. 11, 2014) (although "a denial of the right to call witnesses without an explanation is a violation of New York's . . . regulations, . . . [the] decision to deny, without reason, Plaintiff's request to call . . . witnesses . . . did not rise to the level of a due process violation because Plaintiff failed to allege . . . how he was prejudiced.").  The record shows no indication that Lamora was biased and failed to serve as a fair and impartial hearing officer.  In fact, Harding specifically only relies on a statement made during the hearing where Lamora articulated his point of view.  See Tier III Hrg. Trans. at 7.  It is unclear how such a personal reiteration of the facts can be objectively perceived as an obvious bias.  Rather, it is clear from the hearing transcript that Lamora allowed Harding to state all of his objections for the record, gave Harding the opportunity to retrieve an object from his cell by temporarily adjourning the hearing for its collection, and state a defense against his charges.  See generally id. at 6–11.  Although Harding's proffered defense was ultimately deemed futile, that does not lead to a finding of partiality by Lamora.

Lamora had reliable evidence of Harding's guilt, which was presented in the hearing.  Lamora relied on the Unusual Incident Report as witnessed by Correctional Officer Duprey, which stated "[i]nmate Harding came out of the cell and went after Swimley with a cutting instrument."  Dkt. No. 23-7 at 2.  While Harding opposes these factual findings, the record reflects inconsistent and contradictory testimony regarding these facts from Harding.

15

Namely, directly after the incident he explained to investigators that he had given Martin a weapon, yet subsequently he denied any involvement and pled not guilty at his hearing. See id. at 8, 27; Tier III Hrg. Trans. at 5–6, 10. Moreover, although Harding contends that the additional witnesses he needed to testify were material to his defense, one witness was not even present to witness the incident, another had a conflict of interest being an accessory to the alleged assault, and during the hearing, Harding "did not advise [Lamora] what the testimony of the witnesses would be." See Lamora Decl. at ¶ 17; Tier III Hrg. Trans. at 9; Scott, 962 F.2d at 147. "Thus, [Lamora] had no reason to believe that the testimony would be relevant or . . . affect his decision." Scott, 962 F.2d at 147. Because further exposure to inconsistent information is not helpful to appropriately determining the hearing, Lamora's decision to deny Harding's requests were proper.

Additionally, Lamora had photos of Harding wearing "body armor."[5] See Dkt. No. 23-7 at 39. Despite Harding's contentions that this "armor" was for protection, the fact that Harding was wearing this, coupled with the additional facts discussed above, is "some evidence" sufficient to support the finding that Harding initiated such an assault in order to severely harm Swimley. Finally, there was testimony by a third party from the New York State Office of Mental Health who stated that there were no mitigating mental health factors to contribute to Harding's actions. Tier III Hrg. Trans. at 7, 12, 16; see Dkt. No. 23-7 at 39. Lamora's determination was made to impress upon Harding that such behavior was impermissible and to deter Harding from committing such incidents in the future. Tier III Hrg. Trans. at 12.

---

[5] The Court finds it noteworthy to state that the "body armor" referred to herein is simply man-made by the inmate by strapping books or magazines to his body to prevent any weapon from puncturing the body. The existence of such body armor was photographed by DOCCS.

Harding fails to point to any evidence in the record to show that Lamora came to his determination improperly. In fact, the record demonstrates that Lamora was willing to take a break to help ensure the completeness of the proceedings and to strengthen the proffer. Accordingly, Lamora allowed Harding to present evidence; Lamora considered Harding's defense and the countervailing evidence; and ultimately found the defense unpersuasive based on the reasons articulated above. Lamora chose a different outcome than Harding would have preferred, principally that Harding was guilty of the disciplinary infraction charged. As such, despite Hardings's contentions of bias, the record is clear that there is no question of material fact regarding the process that Harding was provided.

Accordingly, defendants' motion on this ground should be granted.

### d. Written Statement of Disposition

It is undisputed that Harding received a written statement of the hearing disposition. On April 12, 2011, Harding was present when Lamora rendered his decision at the hearing. Tier III Hrg. Trans. at 12. In reaching his decision, Lamora relied upon, among other things, the Unusual Incident Report reported by Correctional Officer Duprey, Harding's statement to an investigator that he did indeed hand off a cutting instrument to Inmate Martin, photos of Harding wearing "body armor", and the fact that Harding was unable to provide any defense or evidence refuting such claims. See Dkt. No. 23-7 at 2, 8, 27, 39; Tier III Hrg. Trans. at 12. The record indicates that Harding received a written statement of the evidence relied upon and the reasons for the disciplinary action. Tier III Hrg. Trans. at 12–13; Dkt. No. 23-5 at 8. Thus, Harding was provided with a written statement of the Tier III disciplinary hearing disposition. Sira, 380 F.3d at 69.

17

Accordingly, defendants' motion on this ground should be granted.

## E.  Qualified Immunity

Defendants contend that even if Harding's § 1983 Fourteenth Amendment claim is substantiated, they are nevertheless entitled to qualified immunity.  Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229–30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 F. App'x 146 (2d Cir. 2003).  However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights."  Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted)).  A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation.  Aiken, 236 F. Supp. 2d at 230.

Here, the second prong of the inquiry need not be addressed with respect to Harding's Fourteenth Amendment claim against the defendants because, as discussed supra, it has not been shown that defendants violated Harding's Fourteenth Amendment rights.

Accordingly, defendants' motion on this ground should be granted.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 23) is **GRANTED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the . . . recommendation." N.Y.N.D.L.R. 72.1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: November 20, 2014
      Albany, New York

*Christian F. Hummel* (signature)
Christian F. Hummel
U.S. Magistrate Judge